## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**HAROLD JOSEPH FOLEY,**

     **Petitioner,**

**v.**                                          **Case No. 8:15-cv-2800-MSS-SPF**

**SECRETARY, DEPARTMENT
OF CORRECTIONS,**

     **Respondent.**

_____/

## O R D E R

Foley petitions for a writ of habeas corpus under 28 U.S.C. § 2254 and challenges his state court conviction for first-degree murder. (Doc. 1) After the Respondent asserted the petition was time-barred (Doc. 5), the Court determined that the petition is timely and directed the Respondent to respond to the merits of the claims. (Doc. 13) The Respondent responds and submits the relevant state court record (Doc. 14), and Foley replies. (Docs. 17 and 18) After reviewing the pleadings and the state court record, the Court **DENIES** the petition.

## PROCEDURAL HISTORY

A jury found Foley guilty of first-degree premeditated murder (Doc. 14-5 at 4–5), and the trial court sentenced Foley to life without parole. (Doc. 14-5 at 6–7) Foley appealed, and the state appellate court affirmed in a decision without a written opinion. (Doc. 14-5 at 172) The post-conviction court denied Foley relief without an evidentiary hearing (Doc. 14-5 at 250–58), and the state appellate court affirmed in a decision without a written opinion. (Doc. 14-5 at 360) Foley filed a petition alleging ineffective assistance of appellate counsel, and the

1

state appellate court dismissed the petition as untimely. (Doc. 14-5 at 485) Foley's federal petition follows.

## FACTS

On the evening of June 14, 2007, Foley called his mother and his brother and frantically asked them how to administer CPR because his girlfriend was not breathing. (Doc. 14-4 at 115–16, 130) Both his mother and his brother agreed to come over to his apartment but told him to call 911. (Doc. 14-4 at 115–17, 130) When Foley's mother arrived, she saw Foley attempting to administer CPR to Victoria Wilson and she immediately called 911. (Doc. 14-4 at 119–20) Foley showed his mother a mark on Wilson's neck and said, "Ma, they're going to blame me for this." (Doc. 14-4 at 120, 126)

Paramedics responded and discovered Wilson in a small bedroom lying on the floor, not breathing, and without a pulse. (Doc. 14-3 at 328–30) Paramedics attempted to resuscitate Wilson but were unsuccessful. (Doc. 14-3 at 332–38) Foley told a police officer who arrived that he had lived at the apartment for three weeks, Wilson annoyed him that evening around 9:30 P.M., he left the apartment around 10:00 P.M. to ride his bicycle and calm down, and he returned to the apartment forty-five minutes later. (Doc. 14-3 at 356) Foley saw Wilson sleeping in her bedroom, watched television for a short time, returned to the bedroom, and saw Wilson lying on the floor unconscious. (Doc. 14-3 at 356–57) Foley attempted to administer CPR, called his brother and his mother, and asked them to come over to help. (Doc. 14-3 at 357) Foley appeared upset, asked the officer about Wilson, and gave police permission to search the apartment. (Doc. 14-3 at 358–62)

Foley also told a sergeant at the scene that, during the short time that he and Wilson lived together, Wilson repeatedly asked him the same questions over and over, which

frustrated and annoyed Foley. (Doc. 14-3 at 371) Foley saw a detective arrive and asked the sergeant "what type of detective [that the detective] was." (Doc. 14-3 at 373) The sergeant responded that the detective investigated primarily burglaries, and Foley replied: "Good. I will talk to him as long as he is not a homicide detective." (Doc. 14-3 at 373)

The prosecution played four recorded interviews between the detective and Foley. (Doc. 14-4 at 235–53, 259–66, 332–78, 385–90) Foley's statements during those interviews were consistent with his statements to the police officer and the sergeant at the scene. Foley told the detective that he did not immediately call 911 because he did not want to cause Wilson problems at her new job or with her landlord. (Doc. 14-4 at 261–62, 496)

Police found a pair of white tennis shoes without shoelaces next to a coffee table in the living room. (Doc. 14-3 at 421, 430, 447–48) Also, police found a plunger next to a sink in the bathroom, ashes in the sink, and a bundle of burnt shoelaces shoved down the drain. (Doc. 14-3 at 420–21, 435, 443–47, 499–500, 502–03, 517) Foley admitted to the detective that the pair of white tennis shoes in the living room belonged to him (Doc. 14-4 at 361, 411–12) but denied going into the bathroom or knowing anything about the shoelaces in the sink. (Doc. 14-4 at 372–73) Foley had a lighter and a pack of cigarettes in his pocket. (Doc. 14-3 at 484)

The medical examiner who performed an autopsy on Wilson opined that the cause of death was ligature strangulation and that Wilson's ingestion of Valium contributed to her death. (Doc. 14-3 at 543, 555–56) The examiner did not observe any defensive wounds but opined that the Valium, a sedative, could have caused Wilson to become sleepy and could have prevented her from defending herself. (Doc. 14-3 at 548–50, 552–53, 560, 563–64) The examiner further opined that measurements of the shoelaces found in the sink were consistent with measurements of the ligature mark around Wilson's neck. (Doc. 14-3 at 553)

STR DNA testing on one of the shoelaces revealed a major profile that matched Wilson's DNA and a minor profile that was consistent with Foley's DNA. (Doc. 14-4 at 33–36) Two of thirteen areas of the minor profile matched Foley's DNA, and the frequency for that match in the Caucasian population was one in 880. (Doc. 14-4 at 39–40) Foley is Caucasian. (Doc. 14-2 at 10)[1]

Daniel Kern, a thirty-two-time convicted felon, testified that he spoke with Foley in jail about his case, asked Foley, "Well, did you do it," and Foley responded, "You know I killed that b*tch." (Doc. 14-4 at 174–75, 179) Later, Kern asked Foley if he and Wilson ever argued and Foley responded, "[S]he just wouldn't shut the f*ck up. She's one of those types. She's a whack job." (Doc. 14-4 at 180) Foley told Kern that he strangled Wilson with two shoelaces, drank a beer, called his mother, and intended to "get rid of the body." (Doc. 14-4 at 180–82) Foley "didn't think anyone would miss [Wilson]" because "[s]he was a nobody." (Doc. 14-4 at 182) Kern contacted police about Foley's confession after Kern pleaded guilty to pending charges. (Doc. 14-4 at 182–83) Kern faced five to ten years in prison at his sentencing scheduled after Foley's trial. (Doc. 14-4 at 184, 212–13)

## STANDARDS OF REVIEW

**AEDPA**

Because Foley filed his federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act, AEDPA governs his claims. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

---

[1] Y-STR testing on the shoelace revealed a major profile that was consistent with Foley's DNA and a minor profile which lacked sufficient data for interpretation. (Doc. 14-4 at 42–44) With Y-STR testing, four of seventeen areas of the major profile matched Foley's DNA (Doc. 14-4 at 42–43), and the frequency for that match in the Caucasian population was one in ten. (Doc. 14-4 at 54)

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. Clearly established federal law refers to the holding of an opinion by the U.S. Supreme Court at the time of the relevant state court decision. *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law

beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

**Exhaustion and Procedural Default**

A petitioner must exhaust the remedies available in state court before a federal court can grant relief on habeas. 28 U.S.C. § 2254(b)(1)(A). The petitioner must (1) alert the state court to the federal nature of his claim and (2) give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard v. Connor*, 404 U.S. 270, 278 (1971). The state court must have the first opportunity to review and correct any alleged violation of a federal right. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

A federal court may stay — or dismiss without prejudice — a habeas case to allow a petitioner to return to state court to exhaust a claim. *Rhines v. Weber*, 544 U.S. 269 (2005); *Rose v. Lundy*, 455 U.S. 509 (1982). If the state court would deny the claim on state procedural grounds, the federal court instead denies the claim as procedurally barred. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).

Also, a federal court will not review a federal claim that the state court denied on an independent and adequate state procedural ground. *Coleman*, 501 U.S. at 729–30. The last state court reviewing the federal claim must clearly and expressly state that its judgment rests on the state procedural bar. *Harris v. Reed*, 489 U.S. 255, 263 (1989). If the last state court denied the federal claim in an unexplained decision, the federal court looks through the unexplained decision to the last reasoned order to rule on the claim. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). If the last reasoned order imposed a state procedural bar, the

federal court presumes that the later unexplained decision did not silently disregard the bar and consider the merits. *Ylst*, 501 U.S. at 803.

A petitioner may excuse a procedural default on federal habeas by either (1) showing cause for the default and actual prejudice from the alleged violation of federal law or (2) demonstrating a miscarriage of justice. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *House v. Bell*, 547 U.S. 518, 536–37 (2006).

**Ineffective Assistance of Counsel**

Foley asserts ineffective assistance of counsel — a difficult claim to sustain. *Strickland v. Washington*, 466 U.S. 668, 687 (1984), explains:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"[T]here is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

 "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice, the defendant must show "a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

The state appellate court affirmed in a decision without a written opinion the post-conviction court's order denying Foley relief. (Doc. 14-5 at 360) A federal court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume[s] that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). Because the post-conviction court recognized that *Strickland* governed the claims (Doc. 14-5 at 250–51), Foley cannot meet the "contrary to" test in Section 2254(d). Foley instead must show that the state court either unreasonably applied *Strickland* or unreasonably determined a fact.

## ANALYSIS

**Ground One**

Foley asserts that trial counsel was ineffective for not reviewing documents disclosed by the prosecution before trial, which showed that Kern was a confidential informant, and for not investigating his status as a confidential informant. (Doc. 1 at 7–8) ("Ineffective Assistance of Counsel Claim") He further asserts that the prosecution violated his federal rights by presenting false testimony by Kern who told the jury that he did not speak with law enforcement about Foley's case until after he elicited the statements from Foley and after he pleaded guilty. (Doc. 1 at 8–9) ("False Testimony Claim")

**Ineffective Assistance of Counsel Claim**

Foley asserts that trial counsel was ineffective for not reviewing documents disclosed by the prosecution before trial which showed that Kern was a confidential informant and for not investigating his status as a confidential informant. (Doc. 1 at 7–8)

The Respondent concedes that the claim is exhausted. (Doc. 14 at 4) In his post-conviction motion, Foley raised these ineffective assistance of counsel claims and elaborated (Doc. 14-5 at 241–42):

> [Foley] avers here, that during a hearing for new trial, [trial counsel] testified in court that his office including himself, had paperwork stating that Daniel Kern was a confidential informant. But that he and other lawyers in the office working the case, had never read the documentation. This warrants a ruling of ineffective assistance of trial counsel because had he or Attorney Greg Williams read it, they could have prepared to keep Kern off the stand or known before trial that he was, in fact, a confidential informant. Daniel Kern was lethal to the theory of defense. Trial counsel could have and should have protected Foley from Kern's testimony by doing everything possible to prevent the testimony from taking place and/or properly impeach[ing] the witness. Trial counsel did not prepare and investigate the amount of threat this particular

9

witness posed upon [Foley] and the defense theory therefore rendering the witness not impeachable. Daniel Kern was acting clearly as a government agent interrogating Foley without the presence of his attorney and outside the rules of court established by our Supreme Court and our Constitution with plain and clear guarantees for protection from such violations and, the outright contempt of criminal procedure. Counsel was ineffective for not objecting to the State's presentation of Kern and as a result the matter was not preserved for appeal. Even though [a hearing on] the motion [for] new trial was held, the defense was ill-prepared and factually unequipped to overcome the State's rebuttal. Without the error of trial counsel's actions[,] the trial would have resulted in an acquittal. Daniel Kern would not have been allowed to testify and the jury could not convict.

Foley raised the same claim in issue one of his brief on appeal. (Doc. 14-5 at 322–26) The state appellate court affirmed the post-conviction court's order denying the claim in a decision without a written opinion. (Doc. 14-5 at 360) Looking through the unexplained decision to the post-conviction court's order which does provide reasons, the post-conviction court denied the claim as follows (Doc. 14-5 at 255–56) (state court record citations omitted):

[T]he Defendant argues that Counsel was deficient for failing to object to the statements of Daniel Kern, a confidential jail-house informant. The Defendant goes on to allege that had Counsel objected the result of the trial would have been different. The Defendant argues that Counsel should have objected to Mr. Kern's testimony because Mr. Kern was acting in concert with the State, and, therefore, statements made to Mr. Kern were made in violation of his Sixth Amendment right to counsel.

The Defendant's claim must be denied. The Sixth Amendment prohibits law enforcement officers from deliberately eliciting statements from a defendant after the right to counsel has attached. *See Massiah v. United States*, 377 U.S. 201, 206 (1964); *see also United States v. Henry*, 447 U.S. 264, 269 (1980) (interpreting *Massiah* to apply when a state places an undercover jailhouse informant in the same cell as the Defendant and instructs the informant to elicit incriminating

statements). The Sixth Amendment, however, is not violated when the State receives incriminating statements from the Defendant by "luck or happenstance." *Maine v. Moulton*, 474 U.S. 159, 176 (1985) (citing *Henry*, 447 U.S. at 276). Although the Defendant alleges that the State acted in concert with Mr. Kern in a manner that infringed upon the Defendant's Sixth Amendment rights, there is no evidence in the record to indicate that Mr. Kern was working as a confidential informant on the Defendant's case at the time the information was obtained. To the contrary, the record indicates that Mr. Kern was not a government agent and only discussed the Defendant's case with Detective Baron on April 6, 2011, after the admission was made. There is no evidence in the record that indicates that the State had an active role in Mr. Kern sharing the same pod with the Defendant for the purposes of obtaining information. Moreover, the State denies any involvement with Mr. Kern prior to the confession regarding the Defendant's case. Mr. Kern testified that the Defendant volunteered the information to him and that he pled to his crimes prior to disclosing the Defendant's confession to the State and was not promised anything in return for his information. Had Counsel filed a motion to suppress, it would have been denied. Counsel cannot be deficient for failing to raise a meritless argument. *Ferrell v. State*, 29 So. 3d 959, 976 (Fla. 2010).

At trial, Kern denied that he had spoken with police before he spoke with Foley about the murder (Doc. 14-4 at 182–85):

| [Prosecutor:] | Okay. And approximately after you came into the jail in November of 2010, when was it that you came to be housed with Joe Foley? |
|---|---|
| [Kern:] | I went there late January, I believe, around the 22nd, 23rd. I don't know the exact date. |
| [Prosecutor:] | Okay. And that would have been January of this year? |
| [Kern:] | Yes, sir. |
| . . . | |

11

[Prosecutor:]        Okay. And after being moved into the particular pool, did you come to find out what Mr. Foley had been charged with?

[Kern:]              Probably within the first week there we were talking.

[Prosecutor:]        Okay. And what crime was he facing?

[Kern:]              He stated he was facing M-1.

[Prosecutor:]        Okay. And what is that?

[Kern:]              Homicide or murder first degree.

[Prosecutor:]        Was there some time after being housed with him that he began to discuss his charges with you?

[Kern:]              Yes, sir.

. . .

[Prosecutor:]        . . . When he told this information to you, did you still have charges pending at that time?

[Kern:]              Yes, sir.

[Prosecutor:]        And at some point did you admit to those charges that you're facing?

[Kern:]              Yes, sir.

[Prosecutor:]        Before you admitted to those charges that you were facing, had you talked to anyone in law enforcement about what information you had?

[Kern:]              No, sir.

[Prosecutor:]        And after you pled guilty to your charges, was there a sentencing date that was set?

[Kern:]              Yes, sir. April 8, 2011.

| | |
|---|---|
| [Prosecutor:] | And about when did you plea to your charges? |
| [Kern:] | I pled March 11, 2011. |
| [Prosecutor:] | Okay. And was it after that that you reached out to law enforcement? |
| [Kern:] | Yes, sir. |
| [Prosecutor:] | And did law enforcement meet with you? |
| [Kern:] | Yes, sir. |
| [Prosecutor:] | And after they met with you did myself — did I meet with you? |
| [Kern:] | Yes, sir. |

On cross-examination, Kern confirmed that he first spoke with a detective about Foley's incriminating statements on April 6, 2011, two days before his sentencing on April 8, 2011 (Doc. 14-4 at 199):

| | |
|---|---|
| [Trial counsel:] | When you talked to Detective Barton, that was on April 6th, right? |
| [Kern:] | Yes, sir. |
| [Trial counsel:] | You had that sentencing in two days, didn't you? |
| [Kern:] | Yes, sir, I believe. |

During a proffer outside the presence of the jury, Kern admitted that, when he pleaded guilty, he intended to present at his sentencing hearing as mitigating evidence both "a mental health diagnosis of depression" and "[his] work with detectives as a confidential informant." (Doc. 14-4 at 207) Kern confirmed "that mitigation that [he] [had] was all completed before April 8th." (Doc. 14-4 at 207) Kern testified at Foley's trial two months

later, on June 10, 2011. (Doc. 14-4 at 151) Kern explained that the mitigation evidence was

unrelated to his cooperation in this case (Doc. 14-4 at 202–07):

| | |
|---|---|
| [Trial counsel:] | Mr. Kern, on March 11, 2011, you had entered your plea, correct? |
| [Kern:] | Yes, sir. |
| [Trial counsel:] | And [there] was a discussion between you and the judge, correct? |
| [Kern:] | Yes, sir. |
| [Trial counsel:] | And at that time, the judge set sentencing for April 8th, correct? |
| [Kern:] | Yes, sir. |
| [Trial counsel:] | And at that time, the judge said, "By April 8th, we should know where you have any other mitigation to offer." |
| [Kern:] | Hmm? I won't disagree with you and I won't agree. I have to see it. I don't recall every word. |
| [Trial counsel:] | Page 21. Down there at the bottom of page 21 and line 1. |
| [Kern:] | That was probably referring to another issue. Another issue, a confidential issue that has nothing to do with this. |
| [Trial counsel:] | That's referring to — that mitigation is another confidential issue? |
| [Kern:] | Yes. It's with another issue. I would think that it's another issue. I don't know how the judge knew that I had information on that day. |
| [Trial counsel:] | Is it in regards to another case that you planned on testifying in? |

| | |
|---|---|
| [Kern:] | Absolutely not. This is the only case that I've ever done anything like that. |

. . .

| | |
|---|---|
| [Trial counsel:] | So on March 11 the judge told you that you would come back on April 8th so you could offer mitigation? |
| [Kern:] | Okay. |
| [Trial counsel:] | Okay. Is it your testimony that the mitigation you planned to offer was not anything to do with your testimony? |
| [Kern:] | It's my testimony. It's not anything to do with this. I assure you that. |
| [Trial counsel:] | What is that mitigation that you planned on offering? I understand you're concerned. You're saying it's confidential. How are you going to tell? If it's confidential, how are you going to give it to the judge? |
| [Kern:] | It's not confidential to the judge. It's confidential to this courtroom. If I'm told by the judge that I have to divulge it, I will. |

. . .

| | |
|---|---|
| [Trial counsel:] | What mitigation did you plan to offer on April 8th? |
| [Kern:] | Um, I also have a — a mental health diagnosis of depression and I also — I work with detectives as a confidential informant. |

. . .

| | |
|---|---|
| [Trial counsel:] | And that mitigation that you have was all completed before April 8th, correct? |
| [Kern:] | Right. |

Also, Detective Barton testified that he met with Kern in April of 2011 (Doc. 14-4 at 455):

| | |
|---|---|
| [Prosecutor:] | Now, in April of 2011 did you also meet with an inmate by the name of Daniel Kern? |
| [Detective:] | I did. |
| [Prosecutor:] | Okay. And did you as part of your investigation determine whether he, in fact, had been housed with Joe Foley in 2011? |
| [Detective:] | Yes, sir, I did. |
| [Prosecutor:] | And did you determine that he was housed with him between January and March of 2011? |
| [Detective:] | Yes, sir. |

Police violate the Sixth Amendment right to counsel by deliberately eliciting incriminating statements from a defendant who is charged with a crime and has secured counsel. *Massiah v. United States*, 377 U.S. 201, 206 (1964). To determine whether police deliberately elicited the incriminating statements, a court considers (1) whether the individual who elicited the incriminating statements "act[ed] under instructions as a paid informant for the Government," (2) whether the individual who elicited the incriminating statements "was ostensibly no more than a fellow inmate of [the defendant]," and (3) whether "[the defendant] was in custody and under indictment at the time he was engaged in conversation by [the individual]." *United States v. Henry*, 447 U.S. 264, 270 (1980). "[T]he Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." *Maine v. Moulton*, 474 U.S. 159, 176 (1985).

16

Because the state court record demonstrates that Kern elicited the incriminating statements from Foley before speaking with police and that police did not direct Kern to elicit the statements from Foley, the state court did not unreasonably deny the claim. *Lightbourne v. Dugger*, 829 F.2d 1012, 1020 (11th Cir. 1987) ("Regarding the threshold agency inquiry, no 'bright line test for determining whether an individual is a Government agent for purposes of the Sixth Amendment' has emerged. Nevertheless, other circuits have observed that the creation of an agency depends upon the existence of an agreement between the state and the informant at the time that the elicitation takes place.") (citations omitted).

Foley contends that, after trial, trial counsel discovered that he overlooked a document which shows that Kern was a confidential informant. (Doc. 1 at 7) He contends that trial counsel deficiently performed by overlooking the document. (Doc. 1 at 8)

At a hearing on a motion for new trial, trial counsel moved to compel "any and all information, documents, recordings[,] or other materials relative to State witness Daniel Kern's activity as a confidential informant for the State of Florida." (Doc. 14-5 at 80) The prosecutor asserted that the defense had received information about Kern's status as a confidential informant before and during trial, as follows (Doc. 14-5 at 66):

> [Prosecutor:]  With respect[ ] to his status as a confidential informant, again, in our response to their motion for new trial there's two avenues that certainly [ ] was available prior to closing arguments. One was the fact that they were provided in discovery Mr. Kern's housing history, which included the fact that he stated that he was a CI.
>
>          Secondly, there was a proffer that the defense did on a Friday afternoon or Friday when he testified that it came out that he was an informant. This evidence,

both of which occurred prior to there being any closing arguments in the case, and because this was available prior to trial and at trial and the defense chose not to do anything with it until after the verdict came out . . . whatever their prerogative is, [ ] that's certainly not new and material evidence that would be the subject of a motion for new trial.

Trial counsel responded that the prosecutor had disclosed a document before trial which revealed Kern's status as a confidential informant and conceded that he overlooked that document when preparing for the defense (Doc. 14-5 at 75–76) (bolding added):

[Trial counsel:]    [The prosecutor] had indicated that he had provided our office with some documentation regarding Mr. Kern's housing. That is true. Unfortunately, your Honor, I had not seen this as of Friday of last week. What this is, Mr. Kern — [the prosecutor] appears to indicate is an admission that Mr. Kern was an agent of the State. That is not the case, Your Honor. This was submitted on the three snitches that the State was trying to develop. After the continuance of trial on March 2nd, they had three snitches. We addressed each one [of] those in our investigation. Two were totally not credible. That left Mr. Kern as the one individual.

What we were looking for on this report, it was strictly submitted for proof that these three CIs were, in effect, in the same cell with Mr. Foley at one time. This was not submitted as an admission that Mr. Kern was an agent of the State, that he was providing confidential information or any other information.

[The prosecutor] indicates we should have known from that information that he was a confidential informant. Your Honor, if I

18

may, this is what [the prosecutor] is referring to. Your Honor, if you look, it's a half an inch in length with one-sixteenth of an inch letters, and if you read very, very closely it says **"per 98 med ops inmate states he is CI for PCSO NVSA7644."**

The State is indicating this is their disclosure to us that Mr. Kern was a confidential informant. Your Honor, we say this is quite lacking as far as being adequate and honest discovery to the State of someone being a confidential informant.

Even if trial counsel had discovered before trial Kern's status as a confidential informant, a motion to exclude Kern's testimony would not have succeeded. As explained above, Kern admitted during the proffer at trial that he was a confidential informant but denied that he had met with or acted on behalf of police when he spoke with Foley. Even if reasonable counsel would have further investigated Kern's status as a confidential informant after reviewing the document concerning Kern's housing assignment, Foley fails to demonstrate that further investigation would have revealed that Kern acted as an agent on behalf of police when he elicited the incriminating statements from Foley. Because Foley only speculated that further investigation would have revealed that police violated his Sixth Amendment right to counsel, the post-conviction court did not unreasonably deny the claim. *Brownlee v. Haley*, 306 F.3d 1043, 1060 (11th Cir. 2002) ("As we have explained, '[s]peculation is insufficient to carry the burden of a habeas corpus petitioner as to what

evidence could have been revealed by further investigation.'") (quoting *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985)).[2]

**False Testimony Claim**

Foley asserts that the prosecutor violated his federal right to due process by presenting testimony by Kern which was false. (Doc. 1 at 8–9) Foley contends that Kern testified falsely when he stated that he had not spoken with law enforcement about Foley's incriminating statements until April 6, 2011 when he met with the detective. (Doc. 1 at 8) He contends that Kern must have met with the prosecutor between March 11, 2011 and March 14, 2011 because during that time Foley moved from Kern's housing unit in the jail to a different unit. (Doc. 1 at 8) He further contends that the prosecutor directed the jail to move Foley because the prosecutor had listed Kern as a witness in his case after the prosecutor and Kern's attorney met at Kern's change of plea hearing on March 11, 2011. (Doc. 1 at 8)

Foley arguably raised this claim in his post-conviction motion (Doc. 14-5 at 239–42) but failed to raise the claim in his brief on post-conviction appeal. (Doc. 14-5 at 322–26) The post-conviction court did not address the claim in the order denying relief. (Doc. 14-5 at 255–56) Even though Foley failed to give the state court one full opportunity to resolve

_____

[2] The Respondent addresses whether trial counsel was ineffective for not impeaching Kern with his status as a confidential informant. (Doc. 14 at 6–7) Foley does not raise this claim in Ground One of his Section 2254 petition (Doc. 1 at 7–9) and only arguably raises the claim in his reply. (Doc. 17 at 4). Because Foley raised the claim for the first time in his reply, he waived the claim. *Oliveiri v. United States*, 717 F. App'x 966, 967 (11th Cir. 2018). Even so, the post-conviction court denied the claim after determining that "[c]ounsel [ ] inquired as to Mr. Kern's motivations for providing the State with the alleged confession, asking questions about mitigation and the date of his sentencing." (Doc. 14-5 at 256–57) Because the state court record supports the determination (Doc. 14-4 at 185–202, 212–13), the post-conviction court did not unreasonably deny the claim.

the federal claim by invoking one complete round of the state's established appellate review process, the Respondent concedes that ground one in Foley's federal petition is exhausted (Doc. 14 at 4) and therefore expressly waives that defense. 28 U.S.C. § 2254(b)(3). *Boerckel*, 526 U.S. at 845. *Vazquez v. Sec'y, Fla. Dep't Corrs.*, 827 F.3d 964, 966 (11th Cir. 2016). Consequently, the Court addresses the merits of the claim.

To demonstrate a *Giglio* claim, a petitioner must show "'. . . [1] that the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and [2] that the falsehood was material.'" *Raleigh v. Sec'y, Fla. Dep't Corrs.*, 827 F.3d 938, 949 (11th Cir. 2016) (quoting *Ventura v. Att'y Gen., Fla.*, 419 F.3d 1269, 1277 (11th Cir. 2005)).

At trial, Kern testified that he was first transferred to Foley's housing unit on January 22nd or 23rd of 2011. (Doc. 14-4 at 177) During the first week after Kern's arrival, Kern and Foley began to speak about Foley's charges. (Doc. 14-4 at 178) Kern spoke with Foley about the charges four or five times. (Doc. 14-4 at 182) Kern pleaded guilty to his pending charges on March 11, 2011. (Doc. 14-4 at 183) Kern denied that he spoke with the detective about Foley's incriminating statements before he pleaded guilty. (Doc. 14-4 at 182–83) Kern met with the prosecutor after meeting with the detective. (Doc. 14-4 at 183)

In his Section 2254 petition, Foley contends that Kern met with the prosecutor in March of 2011 (Doc. 1 at 8):

> Kern had at least once spoke[n] with the State Attorney's Office about [Foley's] case between March 11 and March 14, 2011 as [Foley] was moved from the cell pod he shared with Kern on March 14, 2011 by direction of the State as Kern was listed as a State witness following his March 11, 2011 meeting with the prosecuting attorney and his own attorney at Kern's plea hearing.

21

In a response to Foley's motion for new trial, the prosecutor confirmed that: "On March 14, 2011, [ ] Kern was transferred to a different location than where he had been house[d] with [Foley]." (Doc. 14-5 at 294) However, a housing history report attached to Foley's brief on post-conviction appeal shows that Kern moved to a new housing unit because of "space needed." (Doc. 14-5 at 354) Likewise, in the response to the motion for new trial, the prosecutor stated: "On May 18, 2011, [ ] Kern was listed as a State witness." (Doc. 14-5 at 295) The state court docket shows that the prosecutor did not file a supplemental witness list in March of 2011. (Doc. 14-2 at 4–5)

Because Foley only speculates that the prosecutor had met with Kern just after Kern pleaded guilty to secure his cooperation against Foley and fails to come forward with any evidence not disclosed by the prosecutor that substantiates that allegation, he fails to demonstrate that the prosecutor presented perjured testimony. *United States v. Stein*, 846 F.3d 1135, 1147 (11th Cir. 2017) ("[B]ecause *Giglio* error is a type of *Brady* violation, the defendant generally must identify evidence the government withheld that would have revealed the falsity of the testimony."); *Maharaj v. Sec'y, Dep't Corrs.*, 432 F.3d 1292, 1313 (11th Cir. 2005) ("In the *Giglio* context, the suggestion that a statement may have been false is simply insufficient; the defendant must conclusively show that the statement was actually false.").

Even if Foley could demonstrate that Kern falsely testified, he fails to demonstrate that the testimony is material. "A falsehood is material if there is any reasonable likelihood that it could have affected the result." *Raleigh*, 827 F.3d at 949 (quotation marks and citation omitted). At most, a meeting between Kern and the prosecutor between March 11, 2011 and March 14, 2011, after Kern learned of Foley's incriminating statements and after he

pleaded guilty, would have supported an inference that Kern pleaded guilty with an agreement by the prosecutor for a mitigated sentence.

At trial, Kern testified that he faced five years to ten years at his sentencing and admitted that his sentencing was scheduled after Foley's trial. (Doc. 14-4 at 184, 212–13) During closing argument, trial counsel capitalized on this testimony and argued that Kern's motivation for testifying against Foley was a reduction in his sentence (Doc. 14-4 at 656):

> [Prosecutor:]    Now, the State wants you to think that the only way [Kern] could get that information was from looking at that big book up there. And that's one way you can get it.
>
> Another way you can get it is you can weasel your way into the POD and you can seek out someone and you can say to yourself, ["]Man, I'm looking at a hundred years in prison. What am I going to do this time? What am I going to do? I got sentencing coming up in two days. Well, I'm going to tell them that I can give them information in a murder case, and I'm going to give them that information.["]

At the post-trial hearing, trial counsel presented a transcript of Kern's sentencing hearing which showed that Kern and the prosecution subsequently agreed to a five-year sentence. (Doc. 14-5 at 90–91) The trial court determined that admission of evidence at trial that the prosecutor subsequently agreed to a five-year sentence would not have changed the outcome at trial (Doc. 14-5 at 104–106):

> [Court:]    [C]ompelling the State to produce how it was that he got five years instead of ten years and what mitigation was presented when there's — there's no record of that. So he walks in and he gets five years, and the defense wants to suggest that because

of that Mr. Kern was lying in trial and somehow secretly he must have conferred with the State through his attorneys and gotten this five-year deal and, therefore, he was lying at trial and that's our newly discovered evidence on which Mr. Foley should get a new trial[.] [I]f there is a case out there that says that[,] that's a basis for a new trial, I haven't seen it.

And the fact is, again, the jury heard he could get five years as a minimum mandatory. He testified to that. The jury heard that. Hearing that now would not change anything about the verdict in this case. I am a hundred percent confident in that, having heard all of the evidence in this trial and everything else that was presented in the context of all of Mr. Kern's testimony, direct examination, cross-examination and proffer, and everything that the jury heard.

Also, at trial, on cross-examination, trial counsel extensively impeached Kern who admitted that he had thirty-two prior felony convictions and seven prior convictions for crimes of dishonesty. (Doc. 14-4 at 200) He admitted that, before he approached Foley in jail, he faced a robbery charge which carried a thirty-year maximum sentence and a grand theft charge which carried a forty-year maximum sentence. (Doc. 14-4 at 186, 189–91) He further admitted that, after eliciting incriminating statements from Foley, he contacted law enforcement, secured a continuance of his sentencing, and intended to present mitigating evidence at his sentencing after Foley's trial. (Doc. 14-4 at 187–88, 201, 212–13) Because trial counsel thoroughly impeached Kern to demonstrate a strong inference that Kern would present his cooperation against Foley as mitigating evidence at his sentencing, Foley could not demonstrate any reasonable likelihood that Kern's false testimony concerning his

purported agreement with the prosecutor could have affected the outcome at trial. *Ventura*, 419 F.3d at 1291. *Ford v. Hall*, 546 F.3d 1326, 1333 (11th Cir. 2008).

Ground One is **DENIED**.

**Ground Two**

Foley asserts that trial counsel was ineffective for not timely demanding his right to a speedy trial. (Doc. 1 at 11–13) He contends that trial counsel waited over a year to proceed to trial and gave the prosecutor the opportunity to bolster the case with the testimony by Kern. (Doc. 1 at 11–12) The post-conviction court denied the claim as follows (Doc. 14-5 at 251–53) (state court record citations omitted):

> [T]he Defendant alleges Counsel was ineffective for failing to protect his speedy trial rights under Florida Rule of Criminal Procedure 3.191(a), and but for this deficiency the outcome of the trial would have been different. Florida Rule of Criminal Procedure 3.191(a) provides that a person charged with a crime by indictment or information "shall be brought to trial . . . within 175 days if the crime charged is a felony." The time periods established by Rule 3.191(a) commence when the person is taken into custody. *See State v. Naveira*, 873 So. 2d 300, 305 (Fla. 2004). The Defendant claims that his right to speedy trial under Rule 3.191(a) was violated because he was incarcerated for over 175 days, more specifically 615 days. This Court, however, finds that his right to speedy trial under Rule 3.191(a) was not violated.
>
> The record reflects that on October 1, 2009, the Defendant was arrested for murder in the first-degree and taken into custody. On December 7, 2009, at a pretrial conference the Defendant's speedy trial rights were waived. Additionally, on November 4, 2010, Counsel moved for a defense continuance. That continuance also constituted a waiver of his speedy trial rights. *State v. Nelson*, 26 So. 3d 570, 576 (Fla. 2010) (finding that "waiver is presumed when a defendant is granted a requested continuance because this action causes a delay in the prosecution that is attributable to the defendant and demonstrates that the defendant is not available for trial"). Thus, prior to the expiration of the 175 days from the date in which the Defendant was taken into custody, his speedy trial

rights were waived, twice. The Defendant has not satisfied the first prong of *Strickland*. Counsel cannot be deemed deficient for waiving speedy trial. *See Randall v. State*, 938 So. 2d 542, 544 (Fla. 1st DCA 2006). Accordingly, the Defendant's claim is denied as it relates to 3.191(a).

. . .

[T]he Defendant also claims that Counsel was ineffective for failing to comply with Rule 3.191(b). Rule 3.191(b) provides that upon demand for speedy trial, the State must try the case within 60 days. The record reflects that on May 2, 2011, Counsel provided this Court with a Written Demand for Speedy Trial, at the request of the Defendant. The trial commenced on June 7, 2011, which is within the prescribed 60 days of the date on which the demand was filed. *See* Fla. R. Crim. P. 3.191(b). Thus, Counsel complied with the procedural requirements of Rule 3.191(b). The Defendant has not successfully alleged a specific omission on the part of Counsel that indicates a failure to protect his right to a speedy trial; thus, he does not meet the first prong of *Strickland*. The Defendant's claim is denied as it relates to Rule 3.191(b) as well.

. . .

[T]he Defendant alleges that his speedy trial rights were violated under both the state and federal constitutions. The Defendant argues that he suffered prejudice as a result of his Counsel's failure to assert his right to speedy trial by spending 615 days in jail and the subsequent judgment is "void."

Unlike the speedy trial rule, the constitutional speedy trial right "is measured in tests of reasonableness and prejudice, not specific numbers of days." *State v. Naveira*, 873 So. 2d 300, 308 (Fla. 2004) (quoting *Blackstock v. Newman*, 461 So. 2d 1021, 1022 (Fla. 3d DCA 1985)). There are four factors pertinent to determining whether the Defendant's constitutional right to speedy trial has been violated: (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant has timely asserted his rights; and (4) the existence of actual prejudice as a result of the delay. *See Barker v. Wingo*, 407 U.S. 514, 531 (1972); *see also Seymour v. State*, 738 So. 2d 984, 985 (Fla. 2d DCA 1999). No one factor is outcome determinative; each case must be reviewed on its own set of facts. *State v. Jenkins*, 899 So. 2d 1238, 1240 (Fla. 4th DCA 2005).

The first factor, the length of the delay, is a "threshold triggering mechanism," and the Court need not consider the other factors unless the delay is so long as to be presumptively prejudicial. *State v. Stuart*, 115 So. 3d 420, 424 (Fla. 2d DCA 2013). In the present case, the Defendant's delay was not presumptively prejudicial. The record reflects that the Defendant was taken into custody on October 1, 2009, waived his right to speedy trial, and the trial commenced on June 7, 2011. Approximately a year and a half elapsed from the date of the Defendant's initial incarceration to the date the jury was empaneled. The Defendant relies upon *Doggett v. United States*, arguing that this delay violates his constitutional right to a speedy trial and is sufficient to be "presumptively prejudicial." 505 U.S. 647 (1992). However, the Defendant fails to demonstrate how a year and a half delay is so unreasonable as to constitute a "presumptively prejudicial delay" particularly in a capital murder case. *See, e.g.*, *Barker*, 407 U.S. 514 (1972) (a more than five-year delay, though extraordinary, constitutes presumptive, not absolute, prejudice); *Madonia v. State*, 648 So. 2d 260 (Fla. 5th DCA 1994) (delay of more than three years was presumptively prejudicial). Thus, the Defendant fails to satisfy this threshold inquiry and this claim is denied.

. . .

[T]he Defendant argues that his right to speedy trial expired, thus the trial court lacked jurisdiction to try the Defendant because he was entitled to a discharge. However, the record reflects that the Defendant's speedy trial rights were waived. Therefore, the Defendant's allegations that the trial court lacked jurisdiction, and was "divested of its jurisdiction to try defendant" due to an expiration of speedy trial, are without merit. Accordingly, this claim is hereby denied.

**Speedy Trial Right Under Rule 3.191, Florida Rules of Criminal Procedure**

Foley asserts that trial counsel was ineffective for not timely demanding his right to a speedy trial under Rule 3.191. (Doc. 1 at 11–13) Whether the trial court violated Foley's right to a speedy trial under Rule 3.191 is an issue of state law, and a state court's determination of state law receives deference in federal court. *Machin v. Wainwright*, 758

F.2d 1431, 1433 (11th Cir. 1985) ("The federal courts must defer to a state court's interpretation of its own rules of evidence and procedure.").

The state court docket shows that police arrested Foley on October 1, 2009, and Foley, through trial counsel, waived his statutory right to a speedy trial on December 7, 2009. (Doc. 14-5 at 264) Further, on November 8, 2010, trial counsel moved for a continuance because trial counsel could not adequately prepare for trial until the prosecution had disclosed all discovery, including results from additional DNA testing, and because a forensic technician whose testimony was necessary for the defense was unavailable until a later date. (Doc. 14-5 at 265)

"An attorney, acting without consent from his client, may waive his client's right to a speedy trial because '[s]cheduling matters are plainly among those [decisions] for which agreement by counsel generally controls.'" *Fayson v. Sec'y, Fla. Dep't Corrs.*, 568 F. App'x 771, 773 (11th Cir. 2014)[3] (quoting *New York v. Hill*, 528 U.S. 110, 115 (2000)). *See also Randall v. State*, 938 So. 2d 542, 544 (Fla. 1st DCA 2006) ("Defense counsel, despite Randall's expressions to the contrary, requested and received a continuance during a pre-trial conference. Accordingly, Randall's right to a speedy trial was waived. This waiver applies even in situations in which the attorney requests the continuance without consulting the defendant or against the defendant's wishes.") (citations omitted).

Rule 3.191(a) required the prosecutor to bring Foley to trial within 175 days, and trial counsel waived Foley's statutory right to a speedy trial before the expiration of that period. Foley contends that trial counsel deficiently performed because, with the delay

---

[3] 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

caused by trial counsel's waiver of the right to a speedy trial under Rule 3.191, the prosecutor was able to secure Kern as a witness before trial. (Doc. 1 at 11–12) However, Kern testified that he first disclosed Foley's incriminating statements to police on April 6, 2011. (Doc. 14-4 at 199) Trial counsel waived Foley's statutory right to a speedy trial on December 7, 2009 and could not have predicted Kern's cooperation at that time. (Doc. 14-5 at 264) Because "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight," the post-conviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 689.

Trial counsel demanded Foley's right to a speedy trial under Rule 3.191 on May 3, 2011. (Doc. 14-5 at 266) At a pretrial hearing, the trial judge conducted a colloquy with Foley who confirmed that he agreed with the demand for a speedy trial (Doc. 14-5 at 270–73):

> [Trial counsel:]   And as the Court's aware, through the pendency of this case, there has been a disagreement between my client and [me] as to on particular trial dates whether we should move to continue or go forward to trial.
>
> He filed a motion which I think is in the court file and best suggests that he believes that a speedy trial should not have been waived, and that he wished to either represent himself or have court-appointed counsel replace myself.
>
> In speaking to him — [on] Friday, I advised him that I would file a written demand for speedy trial. If I could approach the clerk, I'll give the original to the clerk, copy for the Court.
>
> Judge, it's not our position to ask you to move the trial date. It's Mr. Foley's way

of ensuring at least to the best of his ability that the case does proceed to trial on June 7th.

[Court:]        Okay.

[Trial counsel:]        The trial date currently set June 7th is well within the timeframe that the demand for speedy trial kicks in or —

[Court:]        Right.

[Trial counsel:]        — or calls into question. And I think at this point what I am suggesting to the Court is that a brief inquiry [be] made of Mr. Foley that, in fact, he does wish me to file that demand for speedy trial, and should he say that he does, then a brief inquiry as to whether that eliminates or gets rid of any complaints he may have had that are contained in that handwritten motion that he made.

[Court:]        All right. Mr. Foley, do you understand what's going on here today in court so far?

[Foley:]        Yes, Your Honor.

[Court:]        Okay. Did you want to address any issues with me while you're here?

[Foley:]        No, Your Honor.

[Court:]        All right. So you've filed this motion that's in the court file that's a notice of expiration of time for speedy trial, and there were some paragraphs in there that had me concerned that perhaps you were asking me to discharge your court-appointed counsel, or that you were asking to represent yourself at trial. Are either of those true or either of those things you wanted me to consider?

[Foley:]        No, Your Honor. I would like to just withdraw that motion, if I could?

| [Court:] | Okay. So you're not asking me to — to discharge or in effect remove your attorneys from your case — |
| [Foley:] | No. |
| [Court:] | — and appoint some other attorney to represent you? You're not asking me to do that? |
| [Foley:] | No, Your Honor. |
| [Court:] | Okay. Now, [trial counsel], who has been appointed to represent you has handed me a written demand for speedy trial today. If he files that, it doesn't move your trial date up from where it is right now. Today is May 2nd of 2011, and your trial has already been set for June 7th of 2011, so by filing a demand for a speedy trial I wouldn't be required to move your trial date up any closer. It already is within the timeframe of a demand for speedy trial if you file this demand for a speedy trial today; do you understand? |
| [Foley:] | Yes, Your Honor. |
| [Court:] | So, it doesn't matter to me really if you file it or not. Did you want your attorney to file that? |
| [Foley:] | Yes, Your Honor. |

Rule 3.191(b) required the trial to commence no later than sixty days after Foley filed the speedy trial demand. Trial counsel demanded a speedy trial on May 3, 2011 (Doc. 14-5 at 266), and the state court clerk administered the oath to prospective jurors for examination on June 7, 2011. (Doc. 14-3 at 3, 36) Because the trial commenced before the expiration of the sixty-day period and Foley agreed with trial counsel's demand for a speedy trial, trial counsel was not ineffective, and the post-conviction court did not unreasonably deny the

31

claim. Fla. R. Crim. P. 3.191(c) ("A person shall be considered to have been brought to trial if the trial commences within the time herein provided. The trial is considered to have commenced when the trial jury panel for that specific trial is sworn for *voir dire* examination or, on waiver of a jury trial, when the trial proceedings begin before the judge.").

### Federal Constitutional Speedy Trial Right

Foley asserts that trial counsel was ineffective for failing to move to dismiss the charges based on a violation of his federal constitutional right to a speedy trial. (Doc. 1 at 11–13) The grand jury indicted Foley with first-degree premeditated murder, a capital felony, on September 30, 2009 (Doc. 14-2 at 10–11), and the state court clerk administered the oath to prospective jurors for examination on June 7, 2011. (Doc. 14-3 at 3, 36) In a footnote, *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992), explains: "Depending on the nature of the charges, the lower courts have generally found post accusation delay 'presumptively prejudicial' at least as it approaches one year." By concluding that the twenty-month delay in the capital felony case was not presumptively prejudicial, the post-conviction court did not unreasonably apply *Doggett*. The one-year presumptive prejudice rule in the footnote in *Doggett* is dicta. *United States v. Grimmond*, 137 F.3d 823, 828 (4th Cir. 1998) ("In *Doggett*, the Supreme Court suggested in dicta that a delay over one year is presumptively prejudicial."). Clearly established federal law under Section 2254(d)(1) refers to the holding of an opinion by the U.S. Supreme Court. *Howes v. Fields*, 565 U.S. 499, 505 (2012) ("In this context, 'clearly established law' signifies 'the holdings, as opposed to the dicta, of this Court's decisions.'") (citation omitted). The first-degree murder charge was punishable by a mandatory life sentence, the most serious punishment other than death, and

the twenty-month delay did not give rise to a presumption of prejudice under *Doggett*, considering the serious nature of the charge.

Because a motion to dismiss based on a violation of a federal right to a speedy trial would not have succeeded, trial counsel was not ineffective, and the post-conviction court did not unreasonably deny the claim. *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

Even if the post-conviction court unreasonably applied *Doggett*, Foley's federal constitutional speedy trial claim fails under a *de novo* review. *McGahee v. Ala. Dep't Corrs.*, 560 F.3d 1252, 1266 (11th Cir. 2009). *United States v. Ingram*, 446 F.3d 1332, 1336 (11th Cir. 2006) (citations omitted), identifies the four factors in *Barker v. Wingo*, 407 U.S. 514 (1972) relevant to whether a delay violates a defendant's federal constitutional right to a speedy trial:

> [T]he Supreme Court established a four-factor test to determine when a defendant's constitutional right to a speedy trial has been violated. The four factors are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the speedy trial right; and (4) the prejudice to the defendant. "[T]o trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay . . . ." "Only if this threshold point is satisfied may the court proceed with the final three factors in the *Barker* analysis." Delays exceeding one year are generally found to be "presumptively prejudicial." If, after the threshold inquiry is satisfied and the second and third factor are considered, all three of these factors weigh heavily against the Government, the defendant need not show actual prejudice (the fourth factor) to succeed in showing a violation of his right to a speedy trial.

On November 8, 2010, a year and two months after the indictment, trial counsel moved for a continuance because trial counsel could not adequately prepare for trial until

the prosecution had disclosed all discovery, including results from additional DNA testing, and because a forensic technician whose testimony was necessary for the defense was unavailable until a later date. (Doc. 14-5 at 265) Also, trial counsel demanded a speedy trial on May 3, 2011 (Doc. 14-5 at 266), and trial began on June 7, 2011. (Doc. 14-3 at 3, 36) Because (1) the twenty-month delay between the indictment and the trial was not so unreasonable in the first-degree murder case, (2) the defense's need for discovery and for testimony by an expert witness, in part, justified the delay, and (3) the defense demanded a speedy trial just a month before trial began, the first three factors under *Barker* weigh heavily against Foley.

As for the fourth factor of actual prejudice, Foley contends that the delay allowed the prosecutor to secure Kern's prejudicial testimony concerning Foley's incriminating admissions in jail. (Doc. 1 at 11–12) However, because Foley only contends that the prosecution's case strengthened during the delay and does not contend that his defense was hindered by the delay, he fails to demonstrate actual prejudice. *United States v. Gearhart*, 576 F.3d 459, 464 (7th Cir. 2009) (". . . Gearhart was not prejudiced by the delay. Although Gearhart argues that he was prejudiced because the government was able to strengthen its case against him during the delay between indictment and trial, this fact is not relevant to the prejudice analysis."); *United States v. Toombs*, 574 F.3d 1262, 1275 (10th Cir. 2009) (holding that the "defense has not been hindered in the sense envisioned by the *Barker* analysis" where "the government was able to locate and procure the testimony of [the] co-defendant and the primary witness against [the defendant] rendering the government's case much stronger"); *United States v. Trueber*, 238 F.3d 79, 91 (1st Cir. 2001) ("Trueber does

not point to a single authority to support the novel proposition that the potential strength the government's case may acquire over time amounts to prejudice against the defendant.").

Because the first three factors weigh heavily against Foley and Foley fails to demonstrate actual prejudice, a motion to dismiss based on a violation of Foley's federal right to a speedy trial would not have succeeded, and trial counsel was not ineffective. *Pinkney*, 876 F.3d at 1297. *See also United States v. Stapleton*, 39 F.4th 1320, 1327 (11th Cir. 2022) ("[T]he length of delay doesn't weigh *heavily* against the Government unless the *reason* for the delay also weighs against the Government.") (italics in original); *United States v. Oliva*, 909 F.3d 1292, 1301 (11th Cir. 2018) ("An intentional attempt to delay trial in order to hinder the defense is 'weighted heavily against the government.' In contrast, a valid excuse, such as a missing witness, justifies reasonable delay.") (quoting *Barker*, 407 U.S. at 531); *United States v. Villarreal*, 613 F.3d 1344, 1353–54 (11th Cir. 2010) ("A defendant's assertion of his speedy trial right is often 'entitled to strong evidentiary weight in determining whether a defendant is being deprived of the right.' This is so because a timely demand for a speedy trial often supports an inference that the defendant was not at fault for the delay and that the delay prejudiced the defendant.") (quoting *Barker*, 407 U.S. at 531–32).

Ground Two is **DENIED**.

**Ground Three**

Foley asserts that the trial court violated his federal right to counsel and federal right to a speedy trial by requiring him to choose either to proceed with appointed counsel and forgo asserting his right to a speedy trial or to assert his right to a speedy trial and forgo the assistance of counsel. (Doc. 1 at 15–16) ("Trial Claim") He further asserts that trial counsel

was ineffective for not objecting to the trial court's violation of his federal rights. (Doc. 1 at 15–16) ("Ineffective Assistance of Counsel Claim")

**Trial Claim**

Foley asserts that the trial court violated his federal right to counsel and federal right to a speedy trial by requiring him to choose either to proceed with appointed counsel and forgo asserting his right to a speedy trial or to assert his right to a speedy trial and forgo the assistance of counsel. (Doc. 1 at 15–16) The Respondent asserts that the trial claim is unexhausted and procedurally barred. (Doc. 14 at 14–15) Foley contends that he "mention[ed]" the claim in his post-conviction motion and brief on appeal and asserts that *Martinez v. Ryan*, 566 U.S. 1 (2012), excuses the procedural default. (Doc. 1 at 16)

Foley raised this claim in ground one of his post-conviction motion. (Doc. 14-5 at 215–20) However, Foley failed to raise the claim in his brief on appeal. He only mentioned the relevant facts in support of an ineffective assistance of counsel claim — not a trial error claim. (Doc. 14-5 at 329–30) Because Foley failed to give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process, he failed to exhaust the claim. *Boerckel*, 526 U.S. at 845. If Foley returned to state court to exhaust the trial error claim, the state court would deny the claim as procedurally barred. Fla. R. Crim. P. 3.850(c) ("This rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence."). Consequently, the claim is procedurally barred on federal habeas. *Snowden*, 135 F.3d at 736.

Because *Martinez* only applies to a procedurally defaulted ineffective assistance of counsel claim, *Martinez* does not excuse the procedural default, and the claim is procedurally barred from federal review. *Gore v. Crews*, 720 F.3d 811, 816 (11th Cir. 2013).

**Ineffective Assistance of Counsel Claim**

Foley asserts that trial counsel was ineffective for not objecting to the trial court's violation of his federal right to counsel and his right to a speedy trial by requiring him to choose either to proceed with appointed counsel and forgo asserting his right to a speedy trial or to assert his right to a speedy trial and forgo the assistance of counsel. (Doc. 1 at 15–16) The Respondent contends that the claim is meritless for the same reasons the claims in Ground Two are meritless. (Doc. 14 at 14) The Respondent concedes that the claims in Ground Two are exhausted (Doc. 14 at 8) and therefore appears to concede that the ineffective effective assistance of counsel claim in this ground is exhausted.

Even though Foley did not raise this claim in his post-conviction motion (Doc. 14-5 at 220–26), and the post-conviction court did not rule on the claim in the order denying relief (Doc. 14-5 at 251–54), the Respondent expressly waives the exhaustion defense. 28 U.S.C. § 2254(b)(3). Therefore, the Court addresses the claim on the merits. *Vazquez*, 827 F.3d at 966.

As explained in Ground Two, the state court record demonstrates that, at a pretrial hearing, the trial judge conducted a colloquy with Foley who withdrew his motion to discharge trial counsel, who stated that he did not want to represent himself, and who confirmed that he wanted trial counsel to file a demand for a speedy trial. (Doc. 14-2 at 21–23) The trial judge accepted the demand for a speedy trial and scheduled trial within sixty days to comply with Rule 3.191(b). (Doc. 14-2 at 23) Because the record refutes the

allegation that the trial court forced Foley to choose between his right to counsel and his right to a speedy trial, the claim is meritless.

Ground Three is **DENIED**.

**Ground Four**

Foley asserts that trial counsel was ineffective for not objecting to the trial judge's failure to comply with § 918.10(1), Fla. Stat. and Fla. R. Crim. P. 3.390(a) and inform the jury of the maximum punishment for the first-degree murder charge. (Doc. 1 at 18) The post-conviction court denied the claim as follows (Doc. 14-5 at 254):

> The Defendant alleges that the trial court erred in failing to advise the jury of the potential sentence in accordance with Florida Rule of Criminal Procedure 3.390. However, Rule 3.390 only applies when the State is seeking the death penalty. Here, the State was not seeking the death penalty. Thus, Rule 3.390 is inapplicable. Furthermore, claims of trial court error are foreclosed from collateral review. *Jones v. State*, 658 So. 2d 122, 124 (Fla 2d DCA 1995); *Sampson v. State*, 845 So. 2d 271, 272 (Fla. 2d DCA 2003). Accordingly, [this claim] is denied.

Even though the post-conviction court construed Foley's claim as a trial error claim, Foley asserted in his post-conviction motion that trial counsel deficiently performed by not objecting to the trial judge's failure to comply with Rule 3.390, Florida Rules of Criminal Procedure. (Doc. 14-5 at 226) The Respondent concedes that Foley exhausted the claim. (Doc. 14 at 16) Consequently, the Court presumes that the post-conviction court adjudicated the claim on the merits. *Johnson v. Williams*, 568 U.S. 289, 298 (2013) ("Although *Richter* itself concerned a state-court order that did not address *any* of the defendant's claims, we see no reason why the *Richter* presumption should not also apply when a state-court opinion addresses some but not all of a defendant's claims.") (italics in original).

Rule 3.390(a) and § 918.10(1), Fla. Stat., conflict. Rule 3.390(a) (2011) states: "Except in capital cases, the judge shall not instruct the jury on the sentence that may be imposed for the offense for which the accused is on trial." In contrast, § 918.10(1), Florida Statutes, requires the trial judge to inform the jury of the penalty of the offense: "At the conclusion of argument of counsel, the court shall charge the jury. The charge shall be only on the law of the case and must include the penalty for the offense for which the accused is being charged."

State courts recognize the conflict between Rule 3.390(a) and § 918.10(1) and hold that the rule abrogates the statute. *Knight v. State*, 653 So. 2d 457, 458 (Fla. 5th DCA 1995), *aff'd*, 668 So. 2d 596 (Fla. 1996) ("[Rule 3.390(a)] abrogates the legislature's grant of discretion to the trial judge given in section 918.10(1), Florida Statutes (1991) which provides that the trial judge shall instruct the jury 'on the law of the case and must include the penalty for the offense for which the accused is being charged.'"); *Palazzolo v. State*, 754 So. 2d 731, 737 (Fla. 2d DCA 2000) ("There may be merit . . . to a procedural rule allowing the jury to receive an instruction on the penalty comparable to the instruction that the legislature attempted to mandate in section 918.10(1), Florida Statutes (1999). These are issues, however, for resolution in the supreme court in its prospective rule-making capacity."). *See also DeLisle v. Crane Co.*, 258 So. 3d 1219, 1224 (Fla. 2018) ("Generally, the Legislature has the power to enact substantive law while [the state supreme court] has the power to enact procedural law.").

Whether Section 918.10(1) or Rule 3.390(a) required the trial judge to inform the jury of Foley's maximum sentence is an issue of state law, and this Court defers to the state court's determination of state law. *Machin*, 758 F.2d at 1433. Because Rule 3.390(a)

prohibits a trial judge from informing the jury of the penalty that may be imposed in a non-capital case, the trial court would have denied trial counsel's request to inform the jury of the maximum sentence that Foley faced. Consequently, trial counsel was not ineffective, and the post-conviction court did not unreasonably deny the claim. *Pinkney*, 876 F.3d at 1297.

Ground Four is **DENIED**.

**Ground Five**

Foley asserts that the trial court violated his federal right to due process because the prosecutor failed to present sufficient evidence at trial to prove premeditation. (Doc. 1 at 20) ("Trial Claim") He further asserts that appellate counsel was ineffective for not raising the sufficiency of the evidence claim on direct appeal. ("Ineffective Assistance of Appellate Counsel Claim") (Doc. 1 at 20)

**Trial Claim**

Foley asserts that the trial court violated his federal right to due process because the prosecutor failed to present sufficient evidence at trial to prove premeditation. (Doc. 1 at 20) The Respondent asserts that the trial claim is procedurally barred because Foley failed to raise the claim on direct appeal and the post-conviction court denied the claim on a state procedural ground. (Doc. 14 at 16–17)

In his brief on direct appeal, Foley failed to raise the sufficiency of the evidence claim. (Doc. 14-5 at 141–50) Foley did raise the claim in his post-conviction motion (Doc. 14-5 at 245–46), and the post-conviction court denied the claim as follows (Doc. 14-5 at 257–58):

> [T]o the extent the Defendant appears to be challenging the
> sufficiency of the evidence against him at trial, claims

> challenging the admissibility, validity, or sufficiency of the
> evidence against him are not cognizable in a rule 3.850 motion
> and should be raised on direct appeal. *Hoppert v. State*, 68 So. 3d
> 382 (Fla. 2d DCA 2011) (citing *Jackson v. State*, 640 So. 2d 1173,
> 1174 (Fla. 2d DCA 1994)).

The post-conviction court denied the claim on an independent and adequate state procedural ground. Fla. R. Crim. P. 3.850(c). *LeCroy v. Sec'y, Fla. Dep't Corrs.*, 421 F.3d 1237, 1260 n.25 (11th Cir. 2005) ("This Court has already concluded that the procedural requirements of Florida's Rule 3.850 constitute independent and adequate state grounds under the applicable law.") (citing *Whiddon v. Dugger*, 894 F.2d 1266, 1267–68 (11th Cir. 1990)). Because Foley fails to demonstrate either cause and actual prejudice or a miscarriage of justice to excuse a procedural bar, the claim is procedurally barred from federal review. *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536–37.[4]

### Ineffective Assistance of Appellate Counsel Claim

Foley asserts that appellate counsel was ineffective for not raising the sufficiency of the evidence claim on direct appeal. (Doc. 1 at 20) The Respondent asserts that the claim is procedurally barred because Foley raised the claim in a petition alleging ineffective assistance of appellate counsel which the state appellate court dismissed as untimely. (Doc. 14 at 16–17) Even though Foley raised the claim as claim two in his petition (Doc. 14-5 at 455–56), the state appellate court dismissed the petition as untimely. (Doc. 14-5 at 485) Fla. R. App. P. 9.141(d)(5). Because the state appellate court dismissed the claim on an independent and adequate state procedural ground, and Foley fails to demonstrate either

---

[4] Foley submits a memorandum with his reply and argues that actual innocence excuses the procedural bar. (Doc. 18) However, in his reply, Foley asserts that he is actually innocent of a sexual battery and refers to individuals and facts not relevant to this first-degree murder case. (Doc. 18 at 7–8) Consequently, he fails to carry his burden and demonstrate actual innocence. *House*, 547 U.S. at 538.

cause and actual prejudice or a miscarriage of justice to excuse the procedural bar, the claim is procedurally barred from federal review. *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536–37. *Rogers v. Sec'y, Dep't Corrs.*, 829 F. App'x 437, 444 (11th Cir. 2020)[5] ("Fla. R. App. P. 9.141(d)(5) is an independent and adequate state procedural ground that is firmly established and regularly followed.").

Ground Five is **DENIED**.

**Ground Six**

Foley asserts that trial counsel was ineffective for not conducting DNA testing on (1) a cigarette butt, (2) a boot with a bloodstain, and (3) a pair of white tennis shoes. (Doc. 1 at 23–24) The Respondent asserts that Foley only partly exhausted his claim. (Doc. 14 at 17 n.2) In his post-conviction motion, Foley asserted that trial counsel was ineffective for not conducting DNA testing on the boot with the bloodstain and on the cigarette butt — but not on the pair of white tennis shoes. (Doc. 14-5 at 243–44) Because Foley failed to raise the claim concerning the white tennis shoes, he failed to exhaust his remedies in state court for that part of the claim. *Baldwin*, 541 U.S. at 29.

In his brief on appeal, Foley raised for the first time that trial counsel should have conducted DNA testing on the white tennis shoes. (Doc. 14-5 at 345–46) A state appellate court will only review a post-conviction claim if the defendant properly raises the claim in a post-conviction motion and secures a ruling from the post-conviction court. *McFarlane v. State*, 314 So. 3d 648, 652 (Fla. 3d DCA 2021). Consequently, the claim is unexhausted. *Porter v.*

---

[5] 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

*Att'y Gen.*, 552 F.3d 1260, 1268 (11th Cir. 2008), *rev'd on other grounds*, *Porter v. McCollum*, 558 U.S. 30 (2009).

If Foley returned to state court to exhaust the part of the claim concerning the white tennis shoes, the state court would deny the claim as untimely and successive, and consequently, the claim is procedurally defaulted on federal habeas. Fla. R. Crim. P. 3.850(b), (h). *Snowden*, 135 F.3d at 736. Because Foley fails to demonstrate either cause and actual prejudice or a miscarriage of justice to excuse the procedural bar, the part of the claim concerning the white tennis shoes is procedurally barred from federal review. *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536–37.

The post-conviction court denied the parts of the claim concerning the cigarette butt and the boots with the bloodstain, as follows (Doc. 14-5 at 257) (state court record citations omitted):

> The Defendant argues that Counsel was ineffective for failing to order DNA testing on: (1) a cigarette butt collected into evidence from the nearby pool, to show that he was not present in the victim's residence at the time of the murder; and (2) a blood stain on a boot that the Defendant claims was not his, to prove that he is actually innocent. The Defendant argues that but for Counsel's failure to request DNA testing, the outcome of the trial would have been different.
>
> The Defendant's claims are without merit. With regard to the cigarette butt, despite the fact that the Defendant's DNA may be on the cigarette butt, there is no way to establish the exact time the cigarette was in fact smoked, as to exonerate the Defendant or change the outcome of the trial. Further, although the Defendant argues that the blood stain on the boot could have been used to identify another person as the perpetrator, this is mere speculation. The record reflects that the crime scene was not bloody, and in reviewing the crime scene and crime scene photos, there was no blood visible or indicated by the Sheriff's technicians after they used an alternative light source. Also[,] there were no defensive wounds found on the victim's body. The Defendant speculates that the time in which the

> blood stain originated was during the commission of a crime.
> Speculation cannot form the basis of postconviction relief.
> *Johnson v. State*, 921 So. 2d 490, 503–04 (Fla. 2005); *Solorzano v.
> State*, 25 So. 3d 19, 23 (Fla. 2d DCA 2009). The Defendant's
> speculative claim fails to demonstrate a reasonable probability
> that the outcome of the proceedings would have been different.
> Accordingly, [the claim] is denied.

At trial, a crime scene investigator testified that she photographed and collected evidence at the crime scene. (Doc. 14-3 at 497) The investigator photographed an ashtray at a pool near the apartment where Foley and Wilson lived and collected a cigarette butt inside the ashtray. (Doc. 14-3 at 512–13) Also, in a bedroom inside the apartment, another investigator photographed and collected a pair of brown work boots with a spot that looked like blood. (Doc. 14-3 at 640–42) The investigator used a presumptive test to determine that the spot contained blood and used a sterile swab to collect a sample of the substance. (Doc. 14-3 at 642–43) The investigator did not observe any other blood at the scene. (Doc. 14-3 at 645) A sergeant testified that he did not request DNA testing for either the cigarette butt or the blood sample. (Doc. 14-4 at 505–06)

On redirect examination, the sergeant explained why he did not submit the blood sample for DNA testing (Doc. 14-4 at 506–07):

<blockquote>

[Prosecutor:]      Why did you not submit the bloodstain from the boot?

[Sergeant:]      There [are] several reasons. I considered it. Chief among those is this was not a bloody crime scene. In reviewing the crime scene and the crime scene photos there was no blood visible or indicated to me by the Sheriff's technicians after they did the alternative light source. It didn't appear to have been a forced entry. Typically on a forced entry you have broken glass. You have blood. There was no forced entry. Autopsy in viewing

</blockquote>

Vickie Wilson's body indicated there was no defensive wounds. So I would suspect, if she didn't defend herself, that there would have been no injury to the offender that would have left blood behind. This appeared to be someone who was familiar with Victoria Wilson.

Again, no forced entry, nothing was missing from the apartment. There were several valuable items including car keys, cell phone, prescription medications, all within visual sight of where the shoelaces were taken from, the shoes in the living room. I felt at the time and I still do that any evidence that would have forensic value would have best come from Victoria Wilson herself. There is nothing to indicate when that blood droplet on the work boot came from. You're unable to tell how old that was. And, in fact, I learned that it was a dried bloodstain several hours after the homicide. So to me it had been there for an undetermined amount of time, and I didn't feel like it had any significance to the actual offender in the apartment.

In his post-conviction motion, Foley speculated that DNA on the cigarette butt would have matched his DNA and would have proven that he was smoking a cigarette by the pool while two unknown men entered the apartment and killed Wilson. (Doc. 14-5 at 243–44) He further speculated that the blood on the boot "would [have] exonerate[d] him because it would have matched the 'third loci' found on the partially burned shoelaces the State used as material evidence in trial," and "more likely than [not] . . . would have matched either Brad Hendricks, Scott McViney, or Rob, a third ex-boyfriend of [Wilson's]." (Doc. 14-5 at 243) Foley moved to conduct DNA testing on the cigarette butt and the boot with the bloodstain (Doc. 14-5 at 369–74), and the post-conviction court denied the motion

because Foley failed to demonstrate how DNA testing would exonerate him of the murder. (Doc. 14-5 at 377–79)

Even if DNA on the cigarette butt matched Foley's DNA, Foley could not explain how he could have proven that he smoked the cigarette at the precise time when Wilson was strangled. Likewise, even if DNA from the blood on the boot matched Wilson's ex-boyfriends, Foley could not explain how he could prove that the blood spattered onto the boot during the murder. Because Foley only speculated that further investigation would reveal exculpatory evidence, the post-conviction court did not unreasonably deny the claim. *Brownlee*, 306 F.3d at 1060 (quoting *Aldrich*, 777 F.2d at 636).

Ground Six is **DENIED**.

**Ground Seven**

Foley asserts that appellate counsel was ineffective for not arguing on appeal that the trial court erred by empaneling a juror who stated that Ted Bundy had killed his girlfriend. (Doc. 1 at 26) The Respondent asserts that the claim is unexhausted and procedurally barred because Foley failed to raise the claim in state court. (Doc. 14 at 18–19) Foley contends that, because he lacked counsel on post-conviction, *Martinez v. Ryan*, 566 U.S. 1 (2012), excuses the procedural default. (Doc. 1 at 26)

Foley filed a petition alleging ineffective assistance of appellate counsel in state court but failed to assert that appellate counsel was ineffective for not arguing on appeal that the trial court erroneously empaneled the juror. (Doc. 14-5 at 449–60) Also, the state appellate court dismissed the petition as untimely. (Doc. 14-5 at 485) Fla. R. App. P. 9.141(d)(5). Because Foley failed to give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process, Foley

failed to exhaust the claim. *Boerckel*, 526 U.S. at 845. If Foley returned to state court to exhaust the claim, the state appellate court would deny the petition alleging the claim as untimely and successive, and, consequently, the claim is procedurally barred. Fla. R. App. P. 9.141(d)(5), (d)(6). *Snowden*, 135 F.3d at 736. Because *Martinez* does not apply to an ineffective assistance of appellate counsel claim, the claim is procedurally barred from federal review. *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017).

Ground Seven is **DENIED**.

**Ground Eight**

Foley asserts that trial counsel was ineffective for not advising him before trial that the prosecution intended to introduce into evidence at trial (1) a pair of white tennis shoes and (2) a pack of cigarettes and a purple lighter. (Doc. 1 at 28) The post-conviction court denied the claim as follows (Doc. 14-5 at 254–55) (state court record citations omitted):

> The Defendant alleges that Counsel was ineffective for failing to make discovery documents and other evidence available to him. Specifically, the Defendant alleges that two pieces of evidence were admitted into evidence against him, a pair of white sneakers and a pack of cigarettes and a lighter, and had Counsel conferred with him he would have been able to provide Counsel with legal arguments to rebut the State's presentation of evidence. As a result, the Defendant argues that he is prejudiced by the introduction of these items into evidence, and but for Counsel's failure to object at trial he would have received a different outcome.
>
> At the outset, discovery documents are not included in the Court record. Nevertheless, the Court finds that Counsel was not ineffective for failing to disclose these items. First, with regard to the white sneakers, the Defendant fails to show prejudice. The record reflects that the Defendant was found guilty of strangling the victim to death with a pair of shoelaces. The State introduced into evidence the shoelaces that were deemed to be the murder weapon, which was found to have the Defendant's DNA on it. Thus, the State used the shoelaces to inculpate the Defendant, not the shoes themselves.

Furthermore, the defense theory presented was that they were his sneakers and his DNA got on the shoelaces as a result of wear, not murder. Therefore, if Counsel was to object to the introduction of the sneakers, it would inherently remove reasonable doubt from the minds of the jury as to how the Defendant's DNA got on the shoelaces. Counsel cannot be deemed ineffective for failing to object to the introduction of evidence that would directly controvert or undermine the basis of the Defendant's defense. *Cf. State v. Williams*, 797 So. 2d 1235, 1239 (Fla. 2001) (finding that counsel is not ineffective for failing to pursue a defense, if such a defense would have been inconsistent with the defense theory of the case).

Second, the Defendant argues that the cigarettes and lighter the State introduced to imply that he had the means to burn the shoelaces after strangling the victim with it, were not his and only came into his possession after the crime was completed. There is no way to establish the chronological events of when the Defendant actually came into possession of the lighter. As such, even if Counsel raised an objection to its introduction, it would likely be denied. Counsel cannot be deficient for failing to raise a meritless argument. *Ferrell v. State*, 29 So. 3d 959, 976 (Fla. 2010). Thus, the Defendant fails to satisfy the first prong of *Strickland*, and [the claim] is denied.

**Pair of White Tennis Shoes**

At trial, a police officer testified that she observed a pair of white tennis shoes without shoestrings underneath a coffee table in the living room in the apartment. (Doc. 14-3 at 421, 430–31, 447–48, 517) The officer observed ashes in a bathroom sink and a bundle of burned shoelaces lodged in the drain. (Doc. 14-3 at 422–23, 436–38, 445–46, 517)

The medical examiner who conducted the autopsy of Wilson observed a ligature mark around her neck, opined that the cause of death was ligature strangulation, and testified that measurements of the shoestring found in the drain were consistent with measurements of the ligature marks on Wilson's neck. (Doc. 14-3 at 536–41, 543, 553–54)

DNA testing on the shoelaces revealed a minor profile consistent with Foley's DNA. (Doc. 14-4 at 34, 39–40) The prosecution played a recording of a sergeant's interview of

Foley for the jury. During the interview, Foley told the sergeant that he owned two pairs of shoes that he kept in the living room (Doc. 14-4 at 361):

| [Sergeant:] | Do you have shoes with shoelaces? |
|---|---|
| [Foley:] | Yes. Two pairs. They're in the living room. |
| [Sergeant:] | I mean, we're just trying to put all this together. What do they look like? |
| [Foley:] | I've got a pair of Nikes and a pair of cheap, white shoes. |
| [Sergeant:] | Do they all have full sets of shoelaces? |
| [Foley:] | Yes. To my knowledge, I've worn my Nikes on the last two days to day labor. |

The sergeant testified that he showed Foley a photograph of the pair of white tennis shoes without shoelaces, and Foley confirmed that the shoes belonged to him (Doc. 14-4 at 411–12):

| [Prosecutor:] | On June 18, 2011, did you have the opportunity to reinitiate contact with Mr. Foley? |
|---|---|
| [Sergeant:] | Yes, sir. |
| [Prosecutor:] | Okay. And what was the purpose on June 18, 2011 — or excuse me, 2007, to make that contact? |
| [Sergeant:] | The primary reason was to let him know how he can go about retrieving belongings, his clothing that he had moved into the apartment. But by then we had gotten some photographs developed of the crime scene, and I took a photograph of the white sneakers that were in the living room to show him and to find out if those were his because he had |

|                  |                                                                                                          |
|------------------|----------------------------------------------------------------------------------------------------------|
|                  | described a cheap pair of white sneaker-type shoes.                                                       |
| [Prosecutor:]    | May I approach?                                                                                           |
| [Court:]         | Yes.                                                                                                     |
| [Prosecutor:]    | I'll show you State's Exhibit 6, item F. Are those the shoes that you showed Mr. Foley a photo of?        |
| [Sergeant:]      | Yes, sir.                                                                                                 |
| [Prosecutor:]    | When you showed him the photo, what did he say to you?                                                    |
| [Sergeant:]      | He said, "Those are mine, but the last time I saw them they had shoelaces in them."                       |

Because the medical examiner opined that the measurement of the shoelace was consistent with the ligature on Wilson's neck, police discovered the pair of white tennis shoes in the living room without shoelaces, and Foley admitted that the pair of white tennis without shoelaces belonged to him, the pair of white tennis shoes supported a reasonable inference that Foley used the shoelaces to strangle Wilson. Because a motion to exclude the pair of shoes would not have succeeded, trial counsel was not ineffective. § 90.401, Fla. Stat. *Pinkney*, 876 F.3d at 1297. *See, e.g.*, *Rigterink v. State*, 193 So. 3d 846, 873 (Fla. 2016) ("Evidence is not irrelevant or inadmissible simply because it is circumstantial in nature. Here, the shoes presented matched those described on the empty box found in Rigterink's condominium, and a person could reasonably infer that Rigterink owned such shoes. Rigterink's ownership and possession of shoes with a tread consistent to that found in blood at the murder scene tends to prove that Rigterink committed the murders.") (citation omitted).

Also, trial counsel relied on Foley's ownership of the pair of white shoes to explain why DNA testing on the shoelaces revealed a minor profile consistent with Foley's DNA (Doc. 14-4 at 666–67):

> [Trial counsel:] Arguably there is DNA on that shoelace that does belong to Mr. Foley. And I guess there would be DNA of yours on your own shoelace. But why would there be someone else's DNA on your own shoelace? Ryan Satcher never got to test that cigarette butt. He never got to test any swabs from that white shoe where presumably those shoelaces came from. He never got to test the blood from the work boots, blood on the work boots in the bedroom where Victoria Wilson, I guess, was killed. Ryan Satcher didn't get to test that. He didn't get to test it in 2008. He didn't get to test it before Mr. Foley was arrested. He still didn't get to test it after they found somebody else's DNA on the shoelace. There's no excuse for that. . . .

If trial counsel had moved to exclude the pair of shoes, trial counsel could not have explained why DNA testing revealed Foley's DNA on the alleged murder weapon. Consequently, trial counsel did not deficiently perform, and the post-conviction court did not unreasonably deny the claim. *Hunt v. Comm'r, Ala. Dep't Corrs.*, 666 F.3d 708, 727 (11th Cir. 2012); *Jones v. Kemp*, 678 F.2d 929, 931 (11th Cir. 1982).

**Cigarettes and Lighter**

A crime scene investigator testified that, in the early morning on June 15, 2007, about five hours after paramedics discovered Wilson dead (Doc. 14-3 at 320), the investigator photographed Foley at the police department. (Doc. 14-3 at 479–80) The investigator photographed items in Foley's pockets including a lighter and a pack of cigarettes (Doc. 14-3 at 483–84):

[Prosecutor:]      And were — do you also take photos of some contents that were in his pockets?

[Investigator:]      These items I photographed and I was advised they came from his pockets.

[Prosecutor:]      And what are those photographs of?

[Investigator:]      A purple lighter, a key, and a pack of cigarettes.

Another crime scene investigator who processed the crime scene testified that she discovered a burned shoelace in the drain of a bathroom sink (Doc. 14-3 at 499–500):

[Prosecutor:]      . . . Now, show for the jury what these things depict and what you did here.

[Investigator:]      Okay. The first thing we're going to do is an overview of the bathroom. This right here is just showing you the bathroom counter and the location of the sink and what is in the counter area to include what appeared to be a shoelace. So what we do after overalls is we do closer to give you an idea of what exactly is in the sink. Here we have a shoelace. At that time we go underneath the sink which is underneath the counter where you see the P-trap located, take a picture of it as we see it before we do any disturbance to it, took the P-trap off. This is the material that was hanging down from the sink drain from in here, and this is just a closer up to show that it looked — it appeared to be a partial shoelace right here, another close up of it. And right here what you see here is almost like a paint can that we were collecting it in, and these are just up close of the inside of the actual sink drain.

[Prosecutor:]      Okay. And this kind of debris here, what was that? Do you recall?

52

[Investigator:]       It — up here it's a little better to see it. It almost appeared that the shoelace was burned.

Because the medical examiner opined that the measurement of the shoelace was consistent with the ligature on Wilson's neck, police discovered the shoelace burned and stuffed down the drain, and Foley had a lighter and a pack of cigarettes in his pocket just hours after police discovered Wilson dead, Foley's possession of the lighter and cigarettes supported a reasonable inference that Foley burned the shoelaces to destroy the murder weapon. § 90.401, Fla. Stat. *Rigterink*, 193 So. 3d at 873. Because a motion to exclude the lighter and cigarettes would not have succeeded, trial counsel was not ineffective, and the post-conviction court did not unreasonably deny the claim. *Pinkney*, 876 F.3d at 1297.[6]

Ground Eight is **DENIED**.

Accordingly, it is **ORDERED** that Foley's petition (Doc. 1) is **DENIED**. The Clerk is **DIRECTED** to enter a judgment against Foley and **CLOSE** this case.

---

[6] Even if trial counsel successfully moved to exclude evidence of the lighter in Foley's pocket, a crime scene investigator testified that she collected two lighters from a coffee table in the living room of the apartment. (Doc. 14-3 at 506) Even without evidence of the lighter in Foley's pocket, the prosecutor could have argued that Foley had the opportunity to burn the shoelaces with the two lighters on the coffee table. Consequently, Foley could not demonstrate prejudice under *Strickland*. *Strickland*, 466 U.S. at 694.

### DENIAL OF CERTIFICATE OF APPEALABILITY AND
### LEAVE TO PROCEED *IN FORMA PAUPERIS*

Because Foley neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** in Tampa, Florida on August 26, 2022.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE